**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**DAVENPORT DIVISION**

| | | |
|---|---|---|
| MONICA DENISE HUNT-DAVIS, | * | CIVIL NO. 3:15-cv-00095-JAJ-SBJ |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | **MEMORANDUM OPINION AND** |
| | * | **REPORT AND RECOMMENDATION** |
| CAROLYN W. COLVIN, | * | |
| Acting Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |
| | * | |

## I. INTRODUCTION

Plaintiff Monica Denise Hunt-Davis ("Hunt-Davis") seeks judicial review of the Social Security Commissioner's decision denying her Application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and denying her Application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* The case was referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for submission of a Report and Recommendation regarding disposition (Dkt. 9). As set forth below, it is recommended that the decision of the Commissioner be affirmed.

## II. PROCEDURAL HISTORY

Hunt-Davis applied for Social Security Disability Insurance Benefits and Supplemental Security Income on May 16, 2012, with an alleged disability onset date of February 1, 2012. (Administrative Record ("A.R.") 233-239, 240-246.)[1] The Social Security Administration denied her application for benefits initially on October 22, 2012, and upon reconsideration on February 13, 2013. (A.R. 107-108, 138-139.) Based upon a timely request for a hearing, Hunt-Davis'

---

[1] Hunt-Davis filed prior applications for benefits in November 2011, which were denied by the Social Security Administration initially on January 30, 2012. (A.R. 85-86.)

claims were heard before Administrative Law Judge ("ALJ") Shreese M. Wilson on March 20, 2014. (A.R. 35-37, 199-200.)   Hunt-Davis was represented by counsel, and testified on her own behalf. (A.R. 41-72.)   Vocational expert Brian Paprocki responded to hypotheticals presented by the ALJ, and Hunt-Davis' counsel. (A.R. 72-81.)

The ALJ issued a written decision denying Hunt-Davis' application for benefits on June 19, 2014. (A.R. 7-29.)   Hunt-Davis timely requested a review of the ALJ's decision, and the Appeals Council denied review on June 25, 2015. (A.R. 1-6.)   Consequently, the decision of the ALJ stands as the final decision of the Commissioner. (*Id*.)

Hunt-Davis filed her Complaint before this Court on August 21, 2015. (Dkt. 1.)   She asserts the decision is in error because she is "in all respects eligible and qualified to receive benefits under the [A]ct as amended, and the final decision of the Defendant denying benefits under the Act is not based on substantial evidence and is in error." (Complaint ¶ 5.)   Hunt-Davis alleges that the ALJ is bound to include in hypothetical questions presented to the vocational expert any limitations the ALJ found to be present, and she erred in failing to do so; the ALJ erred in finding limitations not credible and leaving them out of the residual functional capacity assessment; the ALJ improperly rejected opinions of Hunt-Davis' medical professionals; the ALJ improperly substituted her opinion for the medical opinion of Hunt-Davis' medical professionals; and the ALJ failed to properly assess Hunt-Davis' credibility. (*Id*. ¶ 7.)   The Commissioner filed an Answer on November 20, 2015 (Dkt. 6) and a copy of the Administrative Record (Dkt. 7).

Hunt-Davis filed a brief (Dkt. 10) in support of her claims on January 22, 2016.   The Commissioner submitted a responsive brief (Dkt. 11) on March 2, 2016.

After reviewing the written submissions, it was determined that a hearing was not warranted.   This matter is considered to be fully submitted.

### III. STANDARD OF REVIEW

When performing judicial review, "[t]he court's task is to determine whether the ALJ's decision 'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quoting *Ford v. Astrue,* 518 F.3d 979, 981 (8th Cir. 2008)); *see also, e.g.*, *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (court "'will affirm the ALJ's findings if supported by substantial evidence on the record as a whole'") (quoted citations omitted)).   "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed. 2d 842 (1971) (Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))).

The "court must consider evidence that supports and detracts from the ALJ's decision," but "'[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013) (quoting *Perkins*, 648 F.3d at 897).   Thus, "[e]ven if substantial evidence supports a contrary outcome, [the court] may not reverse so long as the Commissioner's decision also is supported by substantial evidence." *Randolph v. Barnhart*, 386 F.3d 835, 839 (8th Cir. 2004).

> [The court] will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the court] might have reached a different conclusion had [it] been the initial finder of fact.

*Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quoting *Bradley v. Astrue*, 528 F.3d 1113,

1115 (8th Cir. 2008) (internal quotations and citations omitted)).

The court may reverse the ALJ's decision if it is based on legal error. *Neal v. Barnhart*, 405 F.3d 685, 688 (8th Cir. 2005); *see also Lauer v. Apfel*, 245 F.3d 700, 702 (8th Cir. 2001). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (internal citations omitted).

## IV. REVIEW OF ADMINSTRATIVE RECORD

This Magistrate Judge has reviewed the entire Administrative Record (Dkt. 7), but summarizes only certain portions as background for the specific issues presented by the parties.

### A.  Supplement to Medical Record Summary of ALJ

Typically, this Magistrate Judge sets forth summaries of all of the relevant medical records, assessments by state agency examiners, consultative examination findings, claimant and third-party function reports and testimony.   In this case, however, the ALJ's written decision sets forth an exhaustive summary of all of the medical records and consultative examination. (A.R. 15-26.) Based on a thorough scrutiny of the ALJ's summary of the Administrative Record, this Magistrate Judge finds it accurately sets forth the portions of the record relevant and necessary to the determination of the issues and, therefore, adopts and incorporates herein the ALJ's summary (A.R. 15-26), as supplemented below.

The ALJ determined that Hunt-Davis has severe impairments including degenerative disc disease of the spine, major depressive disorder, and anxiety disorder, and thoroughly discussed the medical findings concerning these impairments. (A.R. 12, 15-26.)   Hunt-Davis acknowledges that the ALJ "touches on every piece of evidence" and "discusses every piece of evidence submitted" by her treating medical sources, but emphasizes that the ALJ does not mention her diagnoses of borderline personality disorder or narcissistic personality disorder. (Dkt. 10, p. 8.)

This Magistrate Judge agrees with Hunt-Davis' assessment – the ALJ does discuss virtually every piece of evidence submitted by Hunt-Davis' treating physicians with the sole exception that the ALJ does not specifically mention a diagnosis for Hunt-Davis of borderline personality disorder or narcissistic personality disorder.   However, after a thorough review of the complete Administrative Record, this Magistrate Judge finds that the ALJ's medical records summary omits only a listing of these specific diagnoses and nothing else relevant to the issues.   The medical records which refer to these diagnoses do not discuss how these conditions limit or impact Hunt-Davis, nor do the records attribute symptoms Hunt-Davis suffers from to these conditions. Indeed, the medical records themselves contain no discussion of these diagnoses other than a general discussion of Hunt-Davis' mental health issues.   As such, the medical records as summarized by the ALJ will be supplemented by the summary below to detail the dates and medical providers making such diagnoses, as well as the findings of the state agency examiner.

On March 4, 2011, April 19, 2011 and May 9, 2011, Dr. Eric Bruster noted a diagnosis for Hunt-Davis of Axis I major depressive disorder, in remission, and anxiety disorder and Axis II borderline personality disorder with narcissistic traits. (A.R. 424-425, 428, 429.)   On December 15, 2011, and January 10, 2012, Hunt-Davis met with Dr. Bruster who noted a diagnosis on both occasions of Axis I major depressive disorder, recurrent moderate and anxiety disorder and Axis II borderline personality disorder and narcissistic personality disorder, rule out. (A.R. 444-446.)

During a therapy session with Hunt-Davis on April 15, 2011, May 20, 2011, and November 11, 2011, Nurse Practitioner Genevieve Nelson noted an Axis I diagnosis of major depressive disorder and anxiety disorder, but did not note any personality disorders for Hunt-Davis. (A.R. 426-427, 430-434.)   On October 24, 2012, and November 29, 2012, Hunt-Davis met with Nurse Practitioner Nelson, who noted Axis I major depressive disorder, recurrent moderate, and anxiety disorder and Axis II borderline personality disorder and narcissistic personality disorder. (A.R.

544-546, 550-552.)   On November 7, 2012, December 14, 2012, February 27, 2013, March 13, 2013, and April 5, 2013, Hunt-Davis met with Social Worker Carla Mohr, who noted the same diagnoses. (A.R. 547-549, 553-554, 564-569.)

Hunt-Davis met with Nurse Practitioner Chris Pries on June 5, 2013, who noted a diagnosis of Axis I major depressive disorder, recurrent, moderate and anxiety disorder and Axis II borderline personality disorder and narcissistic personality disorder. (A.R. 561-563.)

On November 6, 2013, Dr. William Nissen met with Hunt-Davis and indicated a diagnosis of Axis I major depressive disorder, recurrent, chronic and anxiety disorder, chronic and Axis II borderline personality disorder, chronic and narcissistic personality disorder, chronic. (A.R. 558-560.)

On February 12, 2014, Hunt-Davis met with Nurse Practitioner Anabel Flaherty, who noted a diagnosis of Axis I major depressive disorder, recurrent, chronic and anxiety disorder, chronic and Axis II borderline personality disorder, chronic and narcissistic personality disorder, chronic. (A.R. 555-557.)

## B.  State Agency Examiner Report

On February 12, 2013, Dr. John Tedesco conducted a psychiatric review technique assessment of Hunt-Davis. (A.R. 155-169.)   Dr. Tedesco noted that Hunt-Davis has medically determinable impairments of depression, anxiety, PTSD and borderline personality disorder. (A.R. 165.)   Although one or more of Hunt-Davis' medically determinable impairments reasonably can be expected to produce her symptoms, in Dr. Tedesco's assessment Hunt-Davis' statements about the intensity, persistence and functionally limiting effect of the symptoms are not substantiated by the objective medical evidence alone. (A.R. 163.)   Dr. Tedesco found Hunt-Davis to be partially credible as she does have limitations related to her mental diagnoses, but noted inconsistencies. (A.R. 163.)

Dr. Tedesco found Hunt-Davis to have mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. (A.R. 162.)   Dr. Tedesco noted that overall the evidence shows Hunt-Davis does struggle handling stressors, and she has working memory difficulties. (A.R. 166.)   She has problems consistently taking medications based on costs, and does have a history of care for depression and anxiety. (A.R. 166.) Based on her mental medically determinable impairments, Hunt-Davis will have difficulties with sustaining attention and concentration, following detailed instructions, attendance, maintaining pace, interpersonal functioning, judgment and change. (A.R. 166.)   Despite this, Dr. Tedesco concludes that Hunt-Davis can work and interact. (A.R. 166.)   Dr. Tedesco notes that the medical evidence indicates that Hunt-Davis is continuing to receive medication and therapy that helps to control her symptoms. (A.R. 168-169.)   Based on the information available to him, Dr. Tedesco determined that Hunt-Davis is capable of performing work that is simple and repetitive in nature. (A.R. 169.)

## C.  Testimony of Monica Hunt-Davis

Hunt-Davis presented testimony to ALJ Shreese Wilson on March 20, 2014.   Hunt-Davis testified that she was born December 16, 1963, and has two children, a son, age 14 at the time of the hearing, and a daughter, age 13 at the time of the hearing. (A.R. 41-42.)   Hunt-Davis is a single parent, and cares for the children on her own.   (A.R. 42.)   She graduated from high school, and received a bachelor's degree in education. (A.R. 45-46.)   Hunt-Davis' previous experience includes serving as child care director at a local Y, working as a liaison for the Davenport School District, and working as a clerk at FedEx. (A.R. 50-52.)   Since her claimed disability date of February, 2012, she has worked at one job, providing child care for 18-month-old children at a local church/care facility. (A.R. 52, 54.)   Hunt-Davis injured her back on that job, and received

worker's compensation for a period of time. (A.R. 54.)   She continued working there until she was fired for attendance problems. (A.R. 54.)

Hunt-Davis testified that her previous job with the Davenport School District as a school liaison ended with her termination because she was placed on probation. (A.R. 56.)   At the time she was placed on probation, her son was with her family in Tennessee, as she was having difficulties with him. (A.R. 56.)   Hunt-Davis decided to resign and go to Tennessee to retrieve her son from her parents. (A.R. 57.)   When she returned, she testified the position at the school was unavailable as she was not "rehirable." (A.R. 57.)   Hunt-Davis testified she felt that she was in a hostile work environment at the job with the Davenport Schools. (A.R. 57.)

With respect to her current treatments, Hunt-Davis takes Xanax and Trazodone, to accompany a regime of treatment, medications and therapy. (A.R. 50.)   She testified such treatment has been ongoing since she was the victim of a shooting in 1989. (A.R. 58.)   Hunt-Davis claims that as a result of the shooting, she suffers from post-traumatic stress disorder, which affects her ability to feel comfortable with being around other people. (A.R. 60.)   She further claims this also affects her ability to be in the community, and to work in the community in a job with other individuals. (A.R. 60.)   Hunt-Davis testified that the symptoms of the PTSD from the shooting have gotten worse over the years. (A.R. 61.)

With respect to the back injury she suffered at her last job, Hunt-Davis testified that, although her back is better, she is not confident in being able to lift any weight at this time. (A.R. 62-63.)   She believes that her injury has affected her ability to stand and walk at times, but not significantly as it relates to an eight-hour work day. (A.R. 63-64.)   Hunt-Davis believes the injury primarily affects her ability to lift and carry things. (A.R. 64.)

Hunt-Davis normally gets up in the morning around 8:00 a.m., and sometimes helps her children get ready for school. (A.R. 65.)   She will occasionally take her daughter to school. (A.R.

65.)   Typically she does what she has to do to care for her children. (A.R. 66.)   Meals consist of

TV dinners that the children are able to prepare. (A.R. 66.)   Hunt-Davis will send the children

into the grocery store to get food. (A.R. 67.)   Hunt-Davis testified that it is too stressful for her to

cook for her children. (A.R. 66.)   She testified she has discussed these matters with her therapist

and doctors. (A.R. 67.)

Hunt-Davis takes care of her own finances, and makes sure her bills get paid, but she also

has help from friends. (A.R. 67.)   Hunt-Davis sees the friends who assist her frequently as they

come over to the house to check up on her almost daily. (A.R. 68.)   Hunt-Davis does not have any

clubs, groups or organizations she participates in on a regular basis. (A.R. 69.)   Sometimes her

daughter helps her with getting dressed, but Hunt-Davis does not need help in personal hygiene.

(A.R. 69.)   Hunt-Davis testified she does a lot of sleeping during the day, does some reading, and

anticipates what is going to happen next with her children to be in a position to meet their needs.

(A.R. 69.)

### D.  Testimony of Vocational Expert

A vocational expert ("VE"), Brian Paprocki also testified at the hearing on March 20, 2014.

(A.R. 72-81.)   The ALJ presented an initial hypothetical for an individual of Hunt-Davis' age, (48

as of the date of alleged disability and 50, currently), with a high school education and the same

work experience, who is able to:

> lift up to 20 pounds occasionally and 10 pounds frequently. This individual would
> be able to sit/stand/walk up to six hours each in an eight-hour work day. This
> individual should never climb ladders, robes or scaffolds. No more than
> occasionally stoop, kneel, crouch, crawl. This individual would be limited to tasks
> that could be learned for 30 days that are routine and repetitive in nature.
> Additionally, there should be no more than occasional decision making or changes
> in the work setting. So every day when the individual goes to work, their work tasks
> are basically the same and unchanging. This individual should have no more than
> an occasional interaction with the general public, coworkers or supervisors.

(A.R. 75-76.)   The VE testified that such an individual would not be able to return to any of Hunt-

Davis' past relevant work. (A.R. 76.)   However, the VE testified that there would be jobs in the regional or national economy that such an individual could perform, including someone who is an office helper, photocopy machine operator, or collater operator. (A.R. 76-77.)

The ALJ modified the hypothetical as follows: "[a]ssume that individual was able to obtain one of these jobs, but when they . . . would routinely show up for work late or have to leave early . . . at least twice a week, [arrive] ten minutes late for work or have to leave 10 minutes early twice a week due to . . . an unexcused absence. Would that affect the claimant's ability to maintain the jobs?" (A.R. 77.)   The VE responded that an employer "really can't put up with that kind of situation on an ongoing basis, so they wouldn't hold a job very long." (A.R. 78.)

The ALJ asked if "an individual is going to routinely miss work at least two days a month [and] have two unscheduled absences, how does that affect the individual's ability to maintain these jobs?" (A.R. 78.)   The VE replied that one cannot miss more than one day per month on an ongoing basis, and even at that rate that individual would be putting their employment in "severe jeopardy." (A.R. 78.)

The final modification to the hypothetical by the ALJ provided that the individual was able to show up for work on time and work every day, but would become distracted at work, such that they are not focused and lose up to 15% productivity on a regular basis. (A.R. 78.)   The VE responded that he also believed that this would also result in the person not maintaining employment for very long. (A.R. 78-79.)

Hunt-Davis' attorney presented the VE with additional questions and modifications to the hypothetical.   He asked the VE if a person needed more than the morning, lunch and afternoon breaks typically, would that be tolerated by an employer. (A.R. 78-79.)   The VE responded that when you go beyond the normal breaks you are not going to typically be able to make up time by working faster in order to meet the minimum expectations of productivity. (A.R. 80.)   Hunt-

Davis' attorney also inquired whether a person having problems maintaining attention and concentration, and not consistently working two hours without a break, would affect a person's ability to maintain employment. (A.R. 80.)   The VE responded that being unable to work for two consistent hours would present a problem. (A.R. 81.)

### E.  Findings of Administrative Law Judge

After the hearings, ALJ Shreese Wilson made the following findings in a written decision issued on June 19, 2014:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.

2. The claimant has not engaged in substantial gainful activity since February 1, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: degenerative disc disease of the spine, major depressive disorder, and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently. She is limited to sit/stand/walk 6 hours each of an 8-hour workday. She is never to climb ladders, ropes or scaffolds. She is limited to occasional stooping, kneeling, crouching and crawling. She is limited to tasks learned within 30 days that are routine and repetitive in nature; low stress (no more than occasional decision making or changes in a work setting); no more than occasional contact with the general public, coworkers or supervisors.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on December 16, 1963 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(A.R. 12-29.)   After those findings, the ALJ concluded:

Based on the application for a period of disability and disability insurance benefits filed on May 16, 2012, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on May 16, 2012, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(A.R. 29.)

## V. JUDICIAL REVIEW OF DECISION

A claimant is disabled if he is unable "'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting 42 U.S.C. § 1382c(a)(3)(A)); *see also* 42 U.S.C. § 416(i). "The [Social Security Administration] has established a five-step sequential process for evaluating disability claims." *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011).

Step one determines whether the claimant is involved in substantial gainful activity. §§ 404.1520(a)(4)(i),(b); 416.920(a)(4)(i),(b). If so, the claimant is not disabled; if not, step two determines whether the claimant has a "severe" medically determinable impairment (or combination of impairments). §§ 404.1520(a)(4)(ii),

(c); 416.920(a)(4)(ii),(c). If there is no severe impairment, the claimant is not disabled; if there is, step three determines whether the impairments are severe enough to meet a predetermined list of conditions (with duration requirements). §§ 404.1520(a)(4)(iii),(d); 416.920(a)(4)(iii),(d). If so, the claimant is disabled; if not, step four considers the residual functional capacity of the claimant - previously determined by the ALJ - and evaluates whether the claimant has the residual functional capacity to complete his or her past relevant work. §§ 404.1520(a)(4)(iv),(f); 416.920(a)(4)(iv),(f). If the claimant can complete past relevant work, the claimant is not disabled; if not, step five considers the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can do other work. §§ 404.1520(a)(4)(v),(g); 416.920(a)(4)(v),(g). If so, the claimant is not disabled; if not, the claimant is disabled.

*Cuthrell*, 702 F.3d at 1116-17; *see also Jimmerson v. Astrue*, 717 F.Supp.2d 840, 856 (S.D. Iowa 2010) (setting forth five-step evaluation).

ALJ Wilson utilized this five-step process but Hunt-Davis claims the ALJ erred in denying her claim for disability benefits and supplemental security income. As framed in her Memorandum (Dkt. 10), Hunt-Davis makes two primary arguments: (1) the ALJ's finding of mental residual functional capacity is not supported by substantial evidence (*id.* pp. 12-30), and (2) the Commissioner has not sustained her burden of proving that other work exists in the economy that Hunt-Davis can realistically perform (*id.* pp. 30-33). Hunt-Davis also raises a variety of other issues throughout her brief. The Commissioner disputes her assertions and argues that substantial evidence supports both the ALJ's assessment of RFC and the ALJ's finding that Hunt-Davis can do other work. (Def.'s Brief pp. 4-13.)

## A. Arguments of Hunt-Davis

Hunt-Davis' arguments center on her contention that the ALJ erred in failing to consider the combined effects of all of her diagnosed mental impairments. (Pl.'s Mem. p. 12.) Hunt-Davis notes that "[t]he record contains diagnoses from at least three medical sources of a borderline personality disorder and a narcissistic personality disorder" but the ALJ "does not mention them, no less assess them, anywhere in her decision." (*Id.*) She emphasizes the ALJ "makes no mention

of [the] personality disorders in her discussion of severity" at step two of the sequential analysis or at step three when discussing whether the impairments are severe enough to meet one of the listed conditions. (*Id.* pp. 16-17.)   She further emphasizes the ALJ did not include "any limitations that could be attributed to a personality disorder" in the RFC. (*Id.* pp. 12-13.)

In support of her argument, Hunt-Davis relies upon the following provision of the Commissioner's regulations:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled [].

20 C.F.R. §§ 404.1523, 416.923.   She also cites to *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990)(concluding decision is not supported by substantial evidence where "the ALJ failed to consider the combination of Ness' cardiac and psychiatric impairments"), and *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000)(concluding that "[o]n remand, the ALJ must be careful to make credibility findings regarding all alleged impairments and to include all credited impairments in any hypothetical question presented to the vocational expert").

In the view of Hunt-Davis, the ALJ not only failed to "consider the combined effect of all [her] impairments" but "entirely ignored" the diagnoses of the personality disorders contained in the record:

> Starting in March 2011, nearly a year before Ms. Hunt-Davis alleges she became disabled, Dr. Eric Bruster, Psy.D., diagnosed her with a borderline personality disorder with narcissistic traits in addition to his diagnoses of depression and anxiety. (Tr. 425). He repeated this diagnosis in April 2011, May 2011, December 2011, and January 2012 (Tr. 428, 429, 444, 446). On November 6, 2013, Dr. William Nissen, M.D., a psychiatrist, diagnosed Ms. Hunt-Davis with both a borderline personality disorder and a narcissistic personality disorder. (Tr. 558-559).

14

(Pl.'s Mem. p. 14.)   She contends both Dr. Nissen and Dr. Bruster are "legally qualified to establish impairments" under 20 C.F.R. §§ 404.1513(a)(1), (a)(2), and 416.913(a)(1), (a)(2). (*Id.* pp. 14-15.)   In addition to those doctors, Hunt-Davis asserts she "has been diagnosed with both a borderline and narcissistic personality disorder by her therapists, Genevieve Nelson, ARNP, Carla Mohr, LISW, Anabel Flaherty, ARNP, and Chris Pries, ARNP." (*Id.* p. 15; citing A.R. 548, 551, 554, 555, 562, 565, 567, 559.)   She contends this evidence from treating medical sources "established both a personality disorder and a narcissistic personality disorder as medically determined impairments." (*Id.*)

Hunt-Davis furthers her argument by citing to the following statement from the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM") 630 (4th ed. 1994): "Only when personality traits are inflexible and maladaptive and cause significant functional impairment or subjective distress do they constitute Personality Disorders." (Pl.'s Mem. p. 15.)   Hunt-Davis then deduces that she "would not have been diagnosed with such disorders absent significant functional impairment or subjective distress." (*Id.*)   She notes that "[t]he diagnostic criteria of a borderline personality disorder include impulsivity, identity disturbance, affective instability, inappropriate anger, and transient, stress-related paranoid ideation or severe dissociative symptoms." (*Id.*; citing DSM 654.)   She also notes "[t]he diagnostic criteria of a narcissistic personality disorder include a grandiose sense of self-importance, a sense of entitlement, and someone who is interpersonally exploitative." (*Id.* p. 16; citing DSM 661.)   Relying on those diagnostic criteria, Hunt-Davis in turn claims that "her personality disorders affect her ability to function in a work environment. They affect her ability to interact appropriately with others. In the absence of proper consideration, they also affect how someone would consider her credibility." (*Id.* pp. 18-19.)

In regard to her residual functional capacity, Hunt-Davis argues that the ALJ's

determination lacked "any limitations that could be attributed to a personality disorder" and, therefore, "is not supported by substantial evidence." (Pl.'s Mem. p. 19.)   She further asserts: the ALJ "discounted all treating and examining medical source evidence in favor of the opinion of [Dr. John Tedesco,] the non-examining psychologist"; the ALJ "made unwarranted distinctions between GAF[2] scores to discount all opinions of serious limitation in favor of moderate limitation"; the ALJ "discounted the severity of [Hunt-Davis'] symptoms by minimizing the severity of GAF scores that indicated very close to serious symptoms"; and the ALJ "replaced the opinions of treating and examining sources with her own uninformed opinion of the severity of" Hunt-Davis' symptoms. (*Id.* pp. 19-20.)   In the view of Hunt-Davis, because "[a]ll examining and treating source opinions agree that [her] symptoms are more severe than credited by" the ALJ, the RFC "is not supported by any medical evidence, and is thus not supported by substantial evidence." (*Id.* p. 20.)

In support of those challenges, Hunt-Davis points out that Dr. Tedesco opined on February 12, 2013, that Hunt-Davis would be moderately limited in her ability to:

> understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday/workweek without interruption from her psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; perform activities within a schedule, maintain attendance and be punctual within customary tolerances; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond to changes in the work setting; and, set realistic goals or make plans independently of others.

(*Id.* pp. 21-22; citing A.R. 164-165.)   In Hunt-Davis' characterization, Dr. Tedesco concluded that she has the RFC to perform unskilled work in a sustained manner "[d]espite this raft of

---

[2] Global Assessment of Functioning ("GAF") is a numeric scale used to rate social, occupational, and psychological functioning "'on a hypothetical continuum of mental-health illness.'" *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016)(quoting *Pate–Fires,* 564 F.3d at 937 n. 1 (quoting DSM 32)).

moderate limitations." (*Id.* p. 22; citing A.R. 166.)   In her view, neither Dr. Tedesco nor the ALJ addresses the "moderate" limitation in her ability to actually be at the workplace and to arrive there on time. (*Id.*)

In regard to the GAF scores, Hunt-Davis complains that the ALJ "discounted every GAF score of 50 . . . [but] gave weight to every GAF score above 50, despite the fact that the highest GAF score reported for the period after [her] alleged onset date was 52." (*Id.* p. 25.)[3]   She contends the ALJ "has no legally sufficient basis to discount GAF scores of 50 . . . [and] does not have the professional expertise to distinguish between GAF scores of 50 and 51, both of which represent symptoms that are very close in severity." (*Id.* p. 26.)

Hunt-Davis further argues that while "both Dr. Lodico and Dr. Tedesco stated that [she] would have problems with attendance and punctuality," the ALJ's "RFC finding makes no mention whatsoever of any problems with absenteeism or punctuality." (*Id.* p. 29.)   She also points out that "[t]he vocational expert testified that employers would not tolerate absences or lateness." (*Id.*; citing A.R. 77-78.)   Consequently, in the view of Hunt-Davis, the "finding of RFC, absent any mention of absenteeism or punctuality is unsupported by substantial evidence." (*Id.*; citing 42 U.S.C. § 405(g).)

Finally, Hunt-Davis asserts that the Commissioner has not sustained her burden, at step five, of proving that other work exists in the economy that Hunt-Davis can realistically perform. (*Id.* p. 30.)   In doing so, she reargues that the ALJ's

> finding of RFC does not accurately reflect Ms. Hunt-Davis's actual limitations. It fails to include any consideration of Ms. Hunt-Davis's personality disorders. It is

---

[3] The GAF scale ranges from zero to one hundred. *Pate–Fires,* 564 F.3d at 937 n. 1 (quoting DSM 32)). "A GAF of 41 to 50 indicates the individual has '[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning.'" *Id.* at 938 n. 2. "A GAF of 51 to 60 indicates the individual has '[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning.'" *Id.* n. 3.

based on an erroneous, overbroad interpretation of GAF scores. It is based on cherry picked evidence that ignores limitations in concentration and the efficacy of Ms. Hunt-Davis's medications.

(*Id.*)   Because, in Hunt-Davis' view, the vocational expert was not given an accurate picture of her limitations, the vocational expert's testimony is therefore not substantial evidence to support a finding that Hunt-Davis is capable of doing other work in the economy. (*Id.*)   Hunt-Davis insists that "[r]emand is required to command the ALJ to correctly assess RFC and present a proper hypothetical question to the vocational expert, one that accurately represents [her] true mental limitations." (*Id.* p. 33.)

###   B.  Arguments of the Commissioner

In response, the Commissioner insists that substantial evidence supports the ALJ's residual functional capacity assessment. (Def.'s Brief pp. 4-12.)   In the Commissioner's view, Hunt-Davis "has failed to establish error, reversible or not, with respect to her diagnoses of borderline personality disorder and narcissistic personality disorder." (*Id.* p. 5.)   The Commissioner contends Hunt-Davis "does not provide any evidence linking her diagnoses to any functional limitations. Instead, she relies on mere diagnoses, which are insufficient." (*Id.*)   The Commissioner argues that Hunt-Davis' reliance on "generic descriptions of those diagnosis" and the diagnostic criteria for personality disorders are "legal arguments" which cannot substitute for specific medical evidence. (*Id.*)

The Commissioner further argues that Hunt-Davis "failed to establish she had the alleged additional severe impairments, the evidence either comes from non-acceptable medical sources or, to the extent it comes from an acceptable medical source, fails to meet the duration requirement." (*Id.* p. 7.)   As noted by the Commissioner, "only one, isolated diagnosis came during the relevant period, which started in February 2012 and ended in June 2014. [] That diagnosis came in November 6, 2013, but one month later, her treatment providers no longer listed diagnosis in her

treatment notes." (*Id.*; citing A.R. 635, 652.)   The Commissioner emphasizes that "impairments must last twelve months in order to be disabling" and asserts Hunt-Davis "has failed to meet the minimum threshold evidence needed to establish any additional limitations the ALJ should have found severe." (*Id.*)

In addition, the Commissioner argues that Hunt-Davis has not shown harm even assuming the ALJ should have included the personality disorders as severe impairments at step two. (*Id.* p. 6.)   The Commissioner notes the ALJ found Hunt-Davis had other severe impairments and proceeded through step five of the evaluation. (*Id.*)   It is further noted that "the ALJ determined the reviewing examiner's opinions, which considered [Hunt-Davis'] diagnoses of borderline personality disorder and narcissistic traits, was consistent with the record." (*Id.*; citing A.R. 94, 103-104, 119, 134, 150, 165.)   Consequently, in the Commissioner's view, the ALJ continued to consider all of Hunt-Davis' impairments, even past step two, and, therefore, "any potential error at step two was harmless." (*Id.*)

In regard to Hunt-Davis' assertion that the ALJ failed to address her "moderate" ability to be at the workplace and arrive on time, the Commissioner contends her argument gives "undue weight to a checkmark on a form" and ignores the psychologist's narrative opinion. (*Id.* pp. 6-7.) The Commissioner emphasizes the assertion is based merely "on the text box rating from reviewing physician John Tedesco, Ph.D., indicating [Hunt-Davis] had moderate limitations in the 'ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.'" (*Id.* p. 7; citing A.R. 164.)   As noted by the Commissioner, the form states that "the actual mental residual functional capacity assessment is recorded in the narrative discussion(s) in the explanation text boxes." (*Id.*; citing A.R. 163.)   In the narrative assessment, Dr. Tedesco indicated Hunt-Davis could "complete simple, repetitive tasks in a sustained manner" and she could perform that work with her moderate limitations. (*Id.*; citing A.R. 166.)

In regard to Hunt-Davis' assertion that the ALJ improperly discounted GAF scores of 50 or below, the Commissioner responds that "the ALJ's institutional role is to resolve inconsistencies in the medical evidence." (*Id.* p. 8.)   In the Commissioner's view, even if Hunt-Davis "believes the evidence could be interpreted in a different manner, she has failed to show any legal insufficiency in the ALJ's decision" and in essence, she "is asking the Court to reweigh the evidence in her favor, something the Court cannot do." (*Id.*)   The Commissioner believes "[t]he ALJ considered all the evidence, including the GAF scores, and gave well-supported reasons for discounting lower scores, which she did when exercising her duty to resolve inconsistencies." (*Id.*)   Moreover, according to the Commission, it "has declined to endorse GAF scores in disability analysis and has determined GAF scores have no 'direct correlation' to disability adjudication under the regulations." (*Id.*)   The Commissioner further notes that "[t]he latest version of the Diagnostic and Statistical Manual of Mental Disorders (DSM) has discontinued the use of GAF scores because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" (*Id.* pp. 8-9.)

Turning to step five, the Commissioner contends that "the ALJ properly found there were jobs existing in significant numbers in the national economy [Hunt-Davis] could have performed through the date of the ALJ's decision." (*Id.* p. 12.)   The Commissioner first notes that "the ALJ relied on the testimony of a vocational expert [] in finding [Hunt-Davis] was capable of a successful adjustment to other work" and contends such "testimony is substantial evidence supporting the ALJ's finding." (*Id.*)   As viewed by the Commissioner:

> the ALJ asked the VE about an individual of Plaintiff's age, education, work experience, and residual functional capacity (Tr. 77). The VE testified such a person could perform the specific jobs of office helper, photocopy machine operator, and collator operator (Tr. 77). The VE's testimony therefore supports the ALJ's finding Plaintiff was capable of performing other work.

(*Id.* p. 13.)

**C. Analysis by Magistrate Judge**

Hunt-Davis is correct that the ALJ did not explicitly refer to her diagnoses of personality disorders within the written decision.   As recognized by the Eighth Circuit, however, "'an ALJ's failure to cite specific evidence does not indicate that it was not considered.'" *Chaney v. Colvin*, 812 F.3d 672, 678 (8th Cir. 2016) (quoting *England v. Astrue*, 490 F.3d 1017, 1022 (8th Cir. 2007)).   In addition, "'an arguable deficiency in opinion writing that had no practical effect on the decision . . . is not a sufficient reason to set aside the ALJ's decision.'" *Hensley v. Colvin*, 2016 WL 3878219, at *4 (8th Cir. July 18, 2016) (quoting *Welsh v. Colvin*, 765 F.3d 926, 929 (8th Cir. 2014)); *see also Reeder*, 214 F.3d at 988 (citing *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999)).   The ALJ is not free, however, "to ignore medical evidence but rather must consider the whole record." *Reeder*, 214 F.3d at 988.

Here, in the opinion of this Magistrate Judge, the absence of any specific reference to the diagnoses of personality disorders within the ALJ's written decision had no practical effect on the ALJ's findings and ultimate conclusion that Hunt-Davis is not disabled under the applicable sections of the Social Security Act.   Foremost, the overall thoroughness of the ALJ's decision in examining the record in this case is undisputed.   As recognized by Hunt-Davis, the ALJ "touches on every piece of evidence submitted by [the] treating medical sources" and "discusses every piece of evidence submitted by Dr. Bruster, Dr. Nelson, Ms. Mohr, Ms. Flaherty, and Mr. Pries" except the diagnoses of personality disorders. (Pl.'s Mem. p. 17.)   A fair reading of the written decision leaves minimal, if any, doubt the ALJ fully considered the whole record.

In addition, regardless if the written decision may even be arguably deficient, there is substantial evidence to support ALJ Wilson's findings at each step of the required analysis.   As noted above, Hunt-Davis raises several challenges to the ALJ's decision in her complaint and supporting brief, and expounds upon those issues in varying levels.   After examining the

administrative record and the ALJ's written decision, this Magistrate Judge finds the assertions of

Hunt-Davis to be unpersuasive under the applicable standards for this Court's review.

### 1. Finding of Severe Impairments at Step Two

Beginning at step two, the suggestion of Hunt-Davis that the ALJ erred by failing to

mention or consider her personality disorders is unavailing.   The ALJ found Hunt-Davis has the

following severe impairments: degenerative disc disease of the spine, major depressive disorder,

and anxiety disorder. (A.R. 12.)   Contrary to Hunt-Davis' assertion, the evidence in the record

does not establish that her diagnosed personality disorders also should have been included as

severe impairments.   As explained by the Eighth Circuit,

> [a]n impairment is not severe if it amounts only to a slight abnormality that would
> not significantly limit the claimant's physical or mental ability to do basic work
> activities. *See Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d
> 119 (1987); *id.* at 158, 107 S.Ct. 2287 (O'Connor, J., concurring); 20 C.F.R. §
> 404.1521(a). If the impairment would have no more than a minimal effect on the
> claimant's ability to work, then it does not satisfy the requirement of step two. *Page
> v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007). It is the claimant's burden to
> establish that his impairment or combination of impairments are severe. *Mittlestedt
> v. Apfel,* 204 F.3d 847, 852 (8th Cir.2000). Severity is not an onerous requirement
> for the claimant to meet, *see Hudson v. Bowen,* 870 F.2d 1392, 1395 (8th Cir.1989),
> but it is also not a toothless standard, and we have upheld on numerous occasions
> the Commissioner's finding that a claimant failed to make this showing. *See, e.g.,
> Page,* 484 F.3d at 1043–44; *Dixon v. Barnhart,* 353 F.3d 602, 605 (8th Cir.2003);
> *Simmons,* 264 F.3d at 755; *Gwathney v. Chater,* 104 F.3d 1043, 1045 (8th
> Cir.1997); *Nguyen v. Chater,* 75 F.3d 429, 431 (8th Cir.1996).

*Kirby v. Astrue,* 500 F.3d 705, 707-08 (8th Cir. 2007); *see also Jimmerson*, 717 F.Supp.2d at 858-

59 (quoting *Kirby,* 500 F.3d at 707, 708).

The medical records here which relate to Hunt-Davis' personality disorders fail to show,

or even discuss, how those conditions limit in any manner Hunt-Davis' physical or mental ability

to do basic work activities.   Likewise, the testimony provided to the ALJ by Hunt-Davis also fails

to show those personality disorders have more than a minimal effect on her ability to work.   Thus,

in the opinion of this Magistrate Judge, Hunt-Davis has not met her burden to establish that her

personality disorders should have been included as severe impairments at step two.

**2. Meeting Criteria of Listings at Step Three**

The ALJ found Hunt-Davis "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (A.R. 13.)   More on point, the ALJ found that "[t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06." (*Id.*)   After summarizing Hunt-Davis' activities of daily living and social functioning, ALJ Wilson concluded that Hunt-Davis' "ability to engage in daily activities is no more than mildly limited" and "[i]n social functioning, the claimant has moderate difficulties." (*Id.* 13-14.)   The ALJ further concluded that Hunt-Davis' "ability to maintain social functioning is not as limited as she alleges." (A.R. 14.)   The ALJ also concluded that "[w]ith regard to concentration, persistence or pace, the claimant has moderate difficulties" but again found Hunt-Davis' "ability to maintain attention and concentration is not as limited as alleged." (*Id.*)   As for episodes of decompensation, the ALJ found Hunt-Davis "has experienced no episodes . . . which have been of extended duration." (*Id.*)   As a result, because Hunt-Davis' "mental impairments do not cause at least 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration," ALJ Wilson concluded the "paragraph B" criteria under the listings are not satisfied.   The ALJ also considered and concluded that "the evidence fails to establish the presence of the 'paragraph C' criteria." (*Id.*)

Other than a bare assertion, Hunt-Davis has not sufficiently shown, by either pointing to specific evidence or citing applicable law, how the absence of a specific reference to her diagnoses of personality disorders renders ALJ's analysis under step three invalid.   Nor has Hunt-Davis sufficiently explained or established that she has a mental impairment, or combination of mental impairments, that meets or medically equals the severity of one of the listed impairments.

Moreover, based on a review of the record as a whole, this Magistrate Judge finds there is substantial evidence to support ALJ Wilson's analysis and conclusion under step three.

### 3. Assessment of Residual Functional Capacity

When determining whether a claimant can engage in substantial employment, the ALJ must consider the combination of the claimant's mental and physical impairments and determine the claimant's residual functional capacity ("RFC"). *Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); *Baldwin v. Barnhart,* 349 F.3d 549, 556 (8th Cir. 2003). The ALJ must assess the claimant's RFC prior to step four. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). It is a function-by-function assessment of an individual's ability to do work-related activities despite his or her physical or mental limitations. *See, e.g., Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007); *Roberson v. Astrue,* 481 F.3d 1020, 1023 (8th Cir. 2007); *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004); *Depover v. Barnhart,* 349 F.3d 563, 565 (8th Cir. 2003). In other words, "[a] claimant's RFC represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence." *McCoy*, 648 F.3d at 614; *see also Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011); 20 C.F.R. § 404.1545.

Residual functional capacity "is a medical question and 'at least some' medical evidence must support the ALJ's RFC determination." *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) (quoting *Lauer*, 245 F.3d at 704); *see also Martise*, 641 F.3d at 923. "[I]t is the responsibility of the ALJ, [however,] not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 2016 WL 4150922, at *3 (8th Cir. Aug. 5, 2016). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (internal citations and quotation marks omitted); 20 C.F.R. §§

404.1545, 416.945 ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

"The ALJ bears the primary responsibility for determining a claimant's RFC . . . . However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Martise*, 641 F.3d at 923 (citation and internal quotation marks omitted); *see also Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016) ("The claimant has the burden to establish [her] RFC."); *Moore*, 572 F.3d at 523 ("The claimant has the burden of proof to show she is disabled through step four."); *Baldwin*, 349 F.3d at 556 ("It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC.")

In this case, ALJ Wilson found Hunt-Davis has the residual functional capacity

to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently. She is limited to sit/stand/walk 6 hours each of an 8-hour workday. She is never to climb ladders, ropes or scaffolds. She is limited to occasional stooping, kneeling, crouching and crawling. She is limited to tasks learned within 30 days that are routine and repetitive in nature; low stress (no more than occasional decision making or changes in a work setting); no more than occasional contact with the general public, coworkers or supervisors.

(A.R. 15.)   Upon an independent review of the entire record, this Magistrate Judge finds the ALJ's determination is directly in-line with the above-stated principles and supported by substantial evidence.   Hunt-Davis' various arguments challenging ALJ Wilson's assessment are unconvincing.

Foremost, Hunt-Davis has not sufficiently shown any further limitations should be included in the RFC due to her personality disorders.   While the record contains diagnoses of personality disorders, it lacks sufficient evidence supporting the addition of any limitations to the RFC specifically attributable to those conditions.   "'The mere fact that some evidence may support a conclusion opposite to that reached by the Commissioner does not allow this Court to reverse the decision of the ALJ." *Johnson v. Colvin*, 788 F.3d 870, 873 (8th Cir. 2015) (quoting

*Johnson v. Barnhart,* 390 F.3d 1067, 1070 (8th Cir. 2004)).   In addition, it appears the ALJ properly considered but discounted Hunt-Davis' subjective complaints which may have supported further limitations in the RFC.

The standards for evaluating a claimant's subjective complaints are well-established as set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

> [T]he ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence. The ALJ is not required to discuss each *Polaski* factor as long as he acknowledges and considers the factors before discounting a claimant's subjective complaints.

*Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (internal citations and quotations omitted); *see also Buckner*, 646 F.3d at 558.   "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing *Polaski,* 739 F.2d at 1322); *see also Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006); *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004).   The ALJ is required, however, to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford,* 518 F.3d at 982 (quoting *Lewis v. Barnhart,* 353 F.3d 642, 647 (8th Cir. 2003)).

Where an ALJ seriously considers but for good reasons explicitly discredits a claimant's subjective complaints, the court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001); *Buckner*, 646 F.3d at 558.   "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Bradley*, 528 F.3d at 1115 (quoting *Pearsall*, 274 F.3d at 1218).   Thus, courts "'defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Mabry*, 815 F.3d at 389 (quoting *Johnson v. Colvin*, 788 F.3d at 872 (quoting *Gonzales,* 465 F.3d at 894)); *Cox v. Barnhart*, 471 F.3d 902,

907 (8th Cir. 2006); *see also Jimmerson*, 717 F.Supp.2d at 859 (quoting *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).

ALJ Wilson's credibility determinations in this case are supported by good reasons and substantial evidence.  The ALJ determined that, while Hunt-Davis' medically determined impairments could be expected to cause the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible. (A.R. 16.) The ALJ conducts a fairly in-depth analysis and explanation which sufficiently details the reasons for discrediting the subjective limitations expressed by Hunt-Davis and sets forth inconsistencies found in the record. (A.R. 26-28.)

In assessing Hunt-Davis' credibility, among other things, the ALJ notes that Hunt-Davis alleges post-traumatic stress disorder as a result of being shot in the shoulder during a random shooting in 1990, but gave inconsistent accounts of what actually occurred. (A.R. 26.)   The ALJ also notes that Hunt-Davis alleges back problems, but has not sought the treatment expected of one with a disabling back condition, nor shown or testified to limitations expected of one with a disabling back condition. (A.R. 26.)

The ALJ further notes that Hunt-Davis alleges she quit a job at the Davenport schools in June of 2011 because of her impairments, but also gave alternative contrary accounts that she quit the job because she felt it was a hostile work environment and that she left that job because she was moving to take care of family in Tennessee. (A.R. 26.)   In addition, even though Hunt-Davis quit this job, she attempted to obtain unemployment benefits. (A.R. 28.)   The ALJ indicates that Hunt-Davis stated that if she did not receive those benefits, she would have to resort to a "Plan B." (A.R. 28.)

The ALJ also points out that Hunt-Davis has a history of non-compliance with prescribed medication because she could not afford the prescriptions, yet she was on the Iowa Health Care

plan, she chooses to purchase cigarettes and the prescriptions are available in generic form at a greatly reduced cost. (A.R. 26.)   Additionally, the ALJ notes that Hunt-Davis' alleges that she sleeps all day, yet the record shows she engages in most daily activities with little difficulty. (A.R. 27.)   She claims an inability to handle her children, yet claims they do all of the housework for her. (A.R. 27.)

The ALJ ultimately concludes Hunt-Davis' daily activities are not consistent with the degree of symptoms and functional limitations alleged and, based on all of the evidence, finds Hunt-Davis less than credible with regard to the degree of symptoms and functional limitations alleged. (A.R. 27-28.)   In light of the in-depth explanation which details the reasons for finding Hunt-Davis less than credible and the substantial evidence in the record supporting such a conclusion, this Magistrate Judge will not disturb the ALJ's credibility determination in this case.

In addition, the record does not show ALJ Wilson improperly "discounted all treating and examining medical source evidence in favor of the opinion of the non-examining psychologist's opinion" as urged by Hunt-Davis.   As explained by the Eighth Circuit,

> "a treating physician's opinion is generally entitled to substantial weight"; however, such an "opinion does not automatically control in the face of other credible evidence on the record that detracts from that opinion." *Heino v. Astrue,* 578 F.3d 873, 880 (8th Cir.2009) (internal quotations and citation omitted). "Moreover, an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Id.* at 879 (internal quotations and citations omitted). When deciding "how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations." *Casey v. Astrue,* 503 F.3d 687, 692 (8th Cir.2007). "When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." *Davidson v. Astrue,* 501 F.3d 987, 990 (8th Cir.2007) (internal quotations and citation omitted).

*Martise*, 641 F.3d at 925 (quoting *Brown v. Astrue,* 611 F.3d 941, 951–52 (8th Cir. 2010)).   "Thus, '[w]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight.'" *Id.* (quoting *Halverson,* 600 F.3d at 929–30 (internal quotation and citation omitted)).   The Eighth Circuit recently reiterated those same principles:

"A treating physician's opinion 'should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Miller v. Colvin,* 784 F.3d 472, 477 (8th Cir.2015) (quoting *Cunningham v. Apfel,* 222 F.3d 496, 502 (8th Cir.2000)). A treating physician's opinion, however, "does not automatically control or obviate the need to evaluate the record as a whole." *Id.* (quoting *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir.2001)). Rather, "an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* (quoting *Wildman,* 596 F.3d at 964 (further citation omitted)).

*Nowling v. Colvin,* 813 F.3d 1110, 1122–23 (8th Cir. 2016).

Here, Hunt-Davis appears to take issue primarily with the findings by the ALJ related to the GAF scores assessed by her various medical providers. As noted above, the ALJ provides an exhaustive summary of Hunt-Davis' medical records. In doing so, the ALJ notes the GAF score reported by each provider each time it was noted in medical records. Each time the ALJ lists Hunt-Davis' GAF score, she indicates specific reasons why such score should be given weight or not. This Magistrate Judge finds that, when the ALJ discounts a GAF score, in each instance she gives well-supported reasons for doing so, based on the record as a whole, exercising her duty to resolve inconsistencies. The arguments of Hunt-Davis that ALJ Wilson "made unwarranted distinctions between GAF scores to discount all opinions of serious limitation in favor of moderate limitation" and improperly "discounted the severity of [Hunt-Davis'] symptoms by minimizing the severity of GAF scores that indicated very close to serious symptoms" are without merit.

As correctly noted by the Commissioner, "the most recent edition of the DSM discontinued use of the GAF scale." *Mabry*, 815 F.3d at 391, n. 6 (citing DSM 16 (5th ed. Am. Psychiatric Ass'n 2013)). In addition, according to the Eighth Circuit, "GAF scores may be relevant to a determination of disability based on mental impairments. But 'an ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it.'" *Id.* (quoted citations omitted). Just recently, the Eighth Circuit further explained "GAF scores are not

determinative of RFC, see *Nowling v. Colvin*, 813 F.3d 1110, 1116 n. 3 (8th Cir. 2016), but they offer some evidence of a claimant's ability to function." *Hensley*, 2016 WL 3878219, at *4, n. 3.

ALJ Wilson's thorough consideration and assessment of GAF scores in this case are, again, directly in line with the applicable principles.   For example, the ALJ noted Ms. Nelson, a nurse practitioner, assessed Hunt-Davis with GAF scores of 55 in November 2011 and Dr. Bruster assessed Hunt-Davis with GAF scores of 53 in December 2011, which are consistent with moderate symptoms. (A.R. 17-18.)   Upon noting Ms. Nelson assessed Hunt-Davis in April 2012 with a GAF score of 50, which is consistent with serious symptoms, ALJ Wilson did "not afford weight to Ms. Nelson's opinion regarding the GAF score, as it is not consistent with Dr. Bruster's rating." (A.R. 18.)   She further explained: "Ms. Nelson is not a doctor. Thus, Dr. Bruster's opinion is afforded greater weight. Furthermore, the objective evidence as a whole does not support the GAF score suggested by Ms. Nelson." (A.R. 18.)   ALJ Wilson similarly did not afford weight to the state agency examiner's assessment of a GAF score of 50 because "the objective evidence and the record as a whole do not support this degree of limitation. Furthermore, it appears the examiner based the GAF score on the claimant's subjective self-reports rather than clinical findings." (A.R. 20.)   ALJ Wilson did not afford Dr. Nissen's assessment of a GAF score of 50 in November 2013 because "his examination did not reveal any significant problems with mood or affect. In fact, the clinical exam was essentially within normal limits." (A.R. 24.)   As reflected by these examples, it does not appear the ALJ erred in assessing the GAF scores in the record or in affording greater weight to other medical evidence.   Instead, there is substantial evidence supporting the ALJ's consideration of the GAF scores when determining Hunt-Davis residual functional capacity.

For all those reasons, in the opinion of this Magistrate Judge, the ALJ did not err in the assessment of Hunt-Davis' personality disorders in determining her residual functional capacity. Hunt-Davis has not sufficiently established, and the record does not support, that any additional

limitations should have been included in the RFC due to her personality disorders. *See*, *e.g.*, *Mabry*, 815 F.3d at 390 ("The claimant has the burden to establish [her] RFC."). To the contrary, there is substantial evidence in the record showing ALJ Wilson's RFC determination included the necessary limitations to account for Hunt-Davis' mental and physical impairments.

### 4. Capability to Perform Other Jobs

"'Once it is established that the claimant cannot return to her previous occupation, the Commissioner bears the burden to show that a significant number of appropriate jobs exist for the claimant.'" *Boyd*, 2016 WL 4150922, at *4 (quoting *Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010); *see* 42 U.S.C. § 423(d)(2)(A)). Here, after "[c]onsidering the claimant's age, education, work experience, and residual functional capacity," ALJ Wilson found "there are jobs that exist in significant numbers in the national economy that [Hunt-Davis] can perform." (A.R. 28; citing 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, & 416.969(a).) In the opinion of this Magistrate Judge, the ALJ did not err at step five.

The ALJ's determination is properly supported by the vocational expert's testimony in response to the hypothetical questions posed during the hearing on March 20, 2014. (A.R. 72-81.) As recently explained by the Eighth Circuit, "'[o]ne way in which the Commissioner can meet the burden of proof necessary to show that a claimant who suffers from nonexertional pain is not disabled under the Social Security Act is through the testimony of a vocational expert.'" *Boyd*, 2016 WL 4150922, at *4 (quoting *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997)). "'The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.'" *Martise*, 641 F.3d at 927 (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (quotation and citation omitted)). In the view of this Magistrate Judge, ALJ Wilson's hypothetical questions included all of Hunt-Davis' limitations found to exist by the ALJ and set forth in the ALJ's description of Hunt-Davis'

RFC.  The hypothetical questions were therefore proper and the vocational expert's responses constitute substantial evidence supporting the denial of Hunt-Davis' claims.

## VI. RECOMMENDATION

After a thorough examination of the evidence and in accordance with the standards of review the Court must follow, this Magistrate Judge concludes that the ALJ's determination that Monica Hunt-Davis is not disabled under the Social Security Act complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.   Accordingly, it is recommended that the final decision denying disability insurance benefits and supplemental security income to Monica Hunt-Davis be affirmed and judgment be entered in favor of defendant Commissioner of the Social Security Administration.

Pursuant to Federal Rule of Civil Procedure 72(b)(2), the parties shall have until September 6, 2016, to serve and file specific objections to the proposed findings and recommendations.

Dated August 22, 2016.

STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE